BEFORE THE SECOND DIVISION, JULY 18, 1961

No. 65925.—J. E. Bernard & Co., Inc. *v.* United States, protest 59/25770–11135 (Chicago).

LAWRENCE, Judge: An importation of brass sieves 8 inches in diameter was classified by the collector of customs as "Laboratory instrs., cv brass" and duty was imposed thereon at the rate of 25½ per centum ad valorem as provided in paragraph 360 of the Tariff Act of 1930 (19 U.S.C. § 1001, par. 360), as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, 91 Treas. Dec. 150, T.D. 54108.

Plaintiff claims that said sieves should be classified as articles wholly or partly manufactured, composed wholly or in chief value of brass, not colored with gold lacquer, pursuant to the terms of paragraph 397 of said act (19 U.S.C. § 1001, par. 397), as modified, *supra.*

The pertinent text of the relevant statutes is here set forth.

Paragraph 360 of the Tariff Act of 1930, as modified, *supra*:

Scientific and laboratory instruments, apparatus, utensils, appliances (including mathematical instruments but not including surveying instruments), and parts thereof, wholly or in chief value of metal, and not plated with gold, silver, or platinum, finished or unfinished, not specially provided for:
Slide rules * * *
Other (except analytical weights; balances; laboratory scales; laboratory instruments, apparatus, or appliances, for determining the strength of materials or articles in tension, compression, torsion, or shear; moisture testers; pyrometers; and parts of any of the foregoing) _____ 25½% ad val.

Paragraph 397 of said act, as modified, *supra*:

Articles or wares not specially provided for, whether partly or wholly manufactured:
Composed wholly or in chief value of platinum_____ * * *

*     *     *     *     *     *     *

Composed wholly or in chief value of iron, steel, copper, brass, nickel, pewter, zinc, aluminum, or other base metal (except lead), but not plated with platinum, gold, or silver, or colored with gold lacquer:

*     *     *     *     *     *     *

Not wholly or in chief value of tin or tin plate:
Carriages, drays, * * *

*     *     *     *     *     *     *

Other, composed wholly or in chief value of iron, steel, brass, bronze, zinc, or aluminum * * *_____ 19% ad val.

At the trial, the record in *J. E. Bernard & Co., Inc. v. United States*, 44 Cust. Ct. 315, Abstract 63712, was incorporated herein. It is conceded by plaintiff in its brief that "The merchandise in the prior case included 8″ diameter sieves identical to those here involved and 12″ diameter sieves stipulated (and found by the court) to be other than laboratory instruments, classifiable under Par. 397."

Plaintiff's illustrative exhibit 3 was received in evidence as representative of the 8-inch sieve in controversy here.

Plaintiff introduced the testimony of Theodore Van Zelst, founder and president of Soiltest, Inc., the actual importer herein.

The defendant called as its witness Walter Mahlig, who, since 1946, has been in charge of the manufacture and sale of 8-inch test sieves made by the W. S. Tyler Co.

Van Zelst testified that he was a graduate of the University of California with

a degree of bachelor of applied science and had received a bachelor of science degree and a master's degree in civil engineering from Northwestern Technological Institute.

He described the item in controversy as being 8 inches in diameter, with a 2-inch height over the mesh, the mesh being woven wire material with various size openings between the wires. As an example, he pointed out that the 1½-inch-size is one through which a cube measuring 1½ inches on all sides could pass, and such sieves are used for grading material to determine its size. His firm began importing the 8-inch brass sieves in volume in 1955 and 1956. He had become familiar with the use of the sieves in this country in ready-mixed concrete plants, rock crushing operations, in industrial plants for use in grading concrete, metallic powders, ore, and other aggregate materials. The witness had observed the sieves used in California, Washington, Illinois, Wisconsin, Texas, New York, Massachusetts, Washington, D.C., Tennessee, Florida, Puerto Rico, Minnesota, and "* * * I can go on for probably a total of eighteen states, or more." He had seen the sieves being used on job sites involving highway construction in the various states he mentioned. The sales of the commodity were to customers in a wide range of activity, such as ready-mixed producers, of which there are said to be over 3,000 in the United States, and contractors on highway work. He also sells the sieves to concrete production plants; sand and gravel plants; quarries; mines; highway departments; consulting engineering firms; commercial testing laboratories; private testing laboratories; seed producing companies; canners; schools; and Government agencies, such as Soil Conservation Service, Corps of Engineers, and General Services Administration. He stated that there are over 8,000 potential users of these sieves.

Van Zelst further testified that the chief and general use of these 8-inch sieves is in the field-type testing "for the rougher type of use by the contractors, sand and gravel producers, concrete manufacturers, and that type of application. Highway departments use it in the field." It appears from the witness' testimony that, whereas there has always been a limited use for sieves in the field, their use gradually changed so that, "Our company's biggest activity now is in the field of consulting the contractors, to the producers of materials, materials including concrete, and the aggregates that go into it." When employed in road construction, the sieves were used on the job site, not only out of doors but in temporary shacks or sheds, which were maintained on the job site by contractors.

While the witness did not know where the majority of these sieves were used in 1957 and 1958, he testified that, in the year 1959, the chief use of such sieves was for the gradation of materials, but his testimony failed to show where the gradation took place.

It appears that these 8-inch sieves are precision tools or instruments made according to specifications and standards of the American Society for Testing Materials (ASTM). They also meet the specifications of the National Bureau of Standards, as well as other societies authorized to make tests for measuring. These specifications require precision in respect to the diameter and tolerances of the wire used in the mesh, in the openings in the mesh, and the material from which the mesh and frame is made.

Defendant's witness, Mahlig, who had been in charge of the manufacture and the sale of sieves, such as those in controversy, since 1946, had visited numerous plants throughout the United States and, based on his own surveys and observation, his company made 80 per centum of all the 8-inch test sieves sold in this country. As a matter of fact, the importer in this case was one of his good customers. Prior to becoming sales manager for the Tyler Co., Mahlig

had been with the company some 10 years and had gained experience with all kinds of sieves.

In explaining how he had become familiar with the uses of sieves, including the 8-inch sieves, Mahlig testified that, in an effort to sell wire screen and wire cloth throughout the years, his company tried to establish testing standards with different industries so that they could use testing sieves and industrial wire cloth for the screening of materials.

Mahlig had been in hundreds of plants throughout the country and had seen the 8-inch testing sieves used in a great many places, principally in permanent testing laboratories, but, also, as witness Van Zelst had testified, in portable or field testing laboratories set up out of necessity at temporary plant sites.

Mahlig testified that these test sieves were used not only in the aggregate industry but as well in the foundry industry, the abrasive industry, the iron ore industry, the copper mining industry, and virtually any industry that mines material from the earth, in addition to metal manufacturers who have any type of material that has to be sized and checked with a sieve.

When asked if these sieves were used in laboratories, Mahlig replied, "* * * That's their only function." When asked if these were precision type instruments, he said that they were made to rigid specifications which were found to be necessary to secure correct results.

In substance, Mahlig's testimony is that the 8-inch test sieves in controversy are used in quality control tests of materials in permanent or mobile field laboratories.

In *Arthur H. Thomas Co.* v. *United States*, 72 Treas. Dec. 203, T.D. 49102, the court was concerned with the interpretation of the words "scientific and laboratory instruments" in paragraph 360, *supra*, and came to the conclusion "* * * that the two terms, scientific and laboratory, are separate and distinct, and involve two different classes of instruments." From this premise, the court observed:

* * * In other words, the term *scientific* is interpreted as applying to the kind of use made of the article. The term *laboratory* on the other hand is construed according to the place where it is chiefly used. [Italics quoted.]

In the prior *Bernard* case, the record of which is incorporated herein, we held that the provision for laboratory instruments in paragraph 360 of the tariff act is a so-called "use" provision. In that case, a member of Soiltest, Inc., which is the actual importer herein, testified that 75 per centum of the 8-inch sieves sold by his company were used in the field on job sites for testing purposes. We there held that the record was silent as to the use of the commodity beyond that of the importing company in the State of Illinois, and, accordingly, that chief use throughout the principal markets of the United States where such sieves are availed of had not been established.

Although there is additional evidence of chief use of the instant sieves presented by plaintiff's witness in this case, such evidence is not deemed sufficient to show chief use thereof throughout the United States. Defendant's witness Mahlig, who was well qualified to testify by virtue of his 24 years' experience, was quite positive that the instant 8-inch sieves were chiefly used throughout the United States in laboratories.

A careful review of the entire record leads us to the conclusion that plaintiff has failed to establish by the weight of competent evidence that the 8-inch sieves in controversy are not chiefly used throughout the United States in laboratories.

The protest is overruled, and judgment will issue accordingly.